IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

CSC, a minor, by his parents and
next friends, PATOYA BRYANT and
SEAN COBBS, and PATOYA BRYANT,
and SEAN COBBS, individually,

Plaintiffs,

v.

UNITED STATES OF AMERICA,
et al.,

Defendants.

No. 10-0910-DRH

**MEMORANDUM and ORDER**

**HERNDON, Chief Judge:**

I.   **Introduction and Background**

Pending before the Court are two motions for partial summary judgment: one filed by the government (Doc. 45) and the other filed by plaintiffs (Doc. 47). Based on the following, the Court denies the government's motion and grants in part and denies in part plaintiffs' motion.

In November 2010, plaintiffs, CSC, a minor, by his parents and next friends, Patoya Bryant and Sean Cobbs, and Patoya Bryant and Sean Cobbs, individually filed suit against the United States, Southern Illinois Hospital Services, Erin M Shaw and Angela Boatright for negligence (Counts 1,3, 5, 7, & 11), family expense claims (Counts 2, 4, 6, 8, 10, 12, & 14), negligence-respondeat superior (Counts 9

Page **1** of **10**

& 13) (Doc. 2).1 Plaintiffs allege that as a result of defendants' negligence, CSC, a minor, suffered brain damage before birth.

At about 2:10 a.m. on July 29, 2009, Patoya Bryant ("Patoya") was admitted to Memorial Hospital of Carbondale in Carbondale, Illinois. At this time, Patoya, was more than 35 weeks pregnant and complained of decreased fetal movement. Beginning around 2:23 a.m., Patoya was placed on an electric fetal monitor to monitor the heart rate of the fetus. As that time, CSC's fetal heart rate strip ("FHR") showed moderate long term variability and accelerations. These are reassuring FHR findings. At 2:25 a.m. on July 30, 2009, Dr. Afriyie-Gray discussed Patoya's condition with a nurse at the nurse's station.

Beginning around 7:56 a.m. on July 30, 2009, CSC's FHR strip showed minimal long term variability and absent accelerations. These are abnormal FHR tracings. Dr. Bishop reviewed CSC's FHR strips at this time. Also at this time, Angela Boatright was Patoya's nurse.

Around 8:30 a.m. that same day, Dr. Afriyie-Gray examined Patoya and reviewed the FHR strips. At this time, she was aware of the minimal long term variability and absent accelerations. Around 3:58 p.m. on July 30, 2009, CSC's FHR strip showed absent long term variability and no accelerations. Absent long term variability is an abnormal finding that can affect fetal well-being. Boatright was Patoya's nurse at this time.

---

1Plaintiffs settled with Southern Illinois Hospital Services, d/b/a Memorial Hospital of Carbondale, Erin M. Shaw and Angela Boatright.

At 5:32 p.m. and 8:00 p.m. on July 30, 2009, nurses Shaw and Boatright documented late decelerations on CSC's FHR strip. This is an abnormal finding. At 9:18 p.m. on July 30, 2009, Dr. Panchamukhi reviewed CSC's FHR strip and learned that the FHR strip showed minimal to absent variability, no accelerations and some late decelerations. At this time, Nurse Shaw was Patoya's nurse. Dr. Panchamukhi ordered a biophysical profile ("BPP"), which is a fetal well-being test, for the following morning.

From 9:18 p.m. on July 30, 2009 through at least 6:40 on July 31, 2009, CSC's FHR strip showed absent long term variability and no accelerations. During this time, CSC's baseline FHR also dropped. Those are abnormal findings and signs of compromised fetal well-being. Nurse Shaw was on duty at that time. On July 31, 2009 at 6:40, Dr. Bishop reviewed CSC's FHR strips.

At 7:00 a.m. on July 31, 2009, a second BPP was performed and Dr. Bishop was present for the examination. The BPP was 2 out of 10. That was an abnormal score, indicating that CSC's well-being was in jeopardy unless he was promptly delivered. At 7:10 a.m., Nurse Shaw told Dr. Bishop that CSC's BPP score was 2. A nursing note confirms this result and the conversation with Dr. Bishop. However, Dr. Bishop's operative report states that he thought the score was 6 out of 10 instead of 2 out of 10 and that was a result of miscommunication. From about 6:40 a.m. to 9:23 a.m., CSC's FHR strip continued to show absent variability, no decelerations and a low baseline heart rate. Dr. Bishop allowed Patoya to continue laboring during that time period.

At 9:23 a.m. on July 31, 2009, Dr. Bishop ordered a STAT cesarean for Patoya. Dr. Bishop delivered CSC at 9:38 a.m. on July 31, 2009. He was born in a very depressed state. His Apgar scores at 1, 5 and 10 minutes were 0, 1 and 2 (1-10 point scale). CSC was born with an ischemic brain injury and injury to his liver and kidneys.

## II. Summary Judgment

A motion for summary judgment asks that the Court find that a trial based on the uncontroverted and admissible evidence would-as a matter of law-conclude in the moving party's favor and is thus unnecessary. *See* Fed. R. Civ. Pro. 56(c). When evaluating a motion for summary judgment, the Court must give the non-moving party the benefit of all reasonable inferences from the evidence submitted and resolve "any doubt as to the existence of a genuine issue for trial ... against the moving party." *Celotex Corp. v. Catrett,* 477 U.S. 317, 330 n. 2, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Nevertheless, "the Court's favor toward the non-moving party does not extend to drawing inferences that are supported by only speculation or conjecture." *Singer v. Raemisch,* 593 F.3d 529, 533 (7th Cir. 2010). The non-moving party must set forth specific facts showing that there is a material issue for trial. Fed. R. Civ. Pro. 56(e); *Celotex*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265. The key inquiry is the existence of evidence to support a plaintiff's claims or affirmative defenses, not the weight or credibility of that evidence, both of which are assessments reserved to the trier of fact. *See Schacht v. Wis. Dep't of*

*Corrections*, 175 F.3d 497, 504 (7th Cir. 1999). First, the Court will address the government's motion for partial summary judgment first.

### III. Analysis

**A. Government's motion for partial summary judgment**

The government moves for partial summary judgment on plaintiffs' claim that Dr. Bishop was negligent in his prenatal care of Patoya's gestational diabetes. The government alleges that the Court lacks jurisdiction over this claim because the relevant time period in the claims "begin 'at or about 2:10 am on July 30, 2009.'" and that plaintiffs' failed to exhaust their administrative remedies as to this claim.

The FTCA allows an individual to bring suit against the government in federal court for:

> [I]njury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b)(1). However, before a plaintiff may file suit asserting an FTCA claim, the plaintiff must first exhaust any available administrative remedies. *See Palay v. U.S.*, 349 F.3d 418, 425 (7th Cir. 2003); *Kanar v. U.S.*, 118 F.3d 527, 528 (7th Cir. 1997); *see also* 35A Am.Jur.2d *Federal Tort Claims Act* § 161 (2010). Administrative remedies are exhausted when the claimant has presented the claim

to the appropriate federal agency and that agency denied the claim. 28 U.S.C. § 2675(a). A claim is presented when the agency receives a Standard Form 95, or other written notification of the incident, along with a claim for money damages stemming from the incident. 28 C.F.R. § 14.2(a). Failure to present the claim to the proper federal agency prior to commencing suit "mandates dismissal of the claim." *Palay*, 349 F.3d at 425 (citing *McNeil v. U.S.*, 508 U.S. 106, 113, 113 S.Ct. 1980, 124 L.Ed.2d 21 (1993)). A plaintiff is a not required to plead every possible legal theory in the administrative claims. *Deloria v. Veterans Admin.*, 927 F.2d 1009, 1011-12 (7th Cir. 1991).

The government argues that neither the plaintiffs' SF-95s nor the attachments thereto include or allude to any claim that Dr. Bishop mismanaged Bryant's gestational diabetes. The government contends that the plaintiffs presented a claim to the agency based on a set of facts occurring within a discrete period of time (July 30 and 31, 2009) and are now seeking to maintain a suit on the basis of a different set of facts and events allegedly beginning on May 14, 2009. Plaintiffs oppose the motion arguing that the allegation that Dr. Bishop negligently treated Ms. Bryant in the prenatal period (before her admission to the hospital on July 30, 2009) is adequately addressed in the plaintiffs' Form 95 claims. Specifically, plaintiffs maintain that the "Form 95 Addendum" includes "Patoya's prenatal care (March 9, 2009 to birth on July 31, 2009)" in the "DATE AND DAY OF ACCIDENT" section of the Form 95 Addendum.

Here, plaintiffs' allegations in the complaint allege that medical and nursing

negligence were a proximate cause of CSC's permanent brain injury. Also, the complaint and the expert reports allege medical and nursing negligence which plaintiffs contend were a proximate cause of CSC's permanent brain injury. Further, Form 95 Addendum specifically directed the government to three time periods, including "Patoya's prenatal care (March 9, 2009 to birth on July 31, 2009)" (Doc. 44, p. 4). Clearly, plaintiffs are not presenting new legal theories in their complaint or in the expert reports. The Court concludes that the government had sufficient notice of the prenatal time period such that it could properly investigate Bishop's treatment of gestational diabetes. Plaintiffs have identified the claimants and the nature of the claims in the Form 95, the Form 95 Addendum and the complaint. Furthermore, plaintiffs' expert Dr. Bruce Bryan's opinion that Dr, Bishop was negligent in his treatment of Patoya's gestational diabetes is appropriate as it tends to rebut Dr. Bishops' assertion that Patoya was a non-compliant patient in regards to her own care and management of her gestational diabetes. Thus, the Court finds that plaintiffs have exhausted their administrative remedies as to this issue and the Court denies the government's motion for partial summary judgment (Doc. 43).

### B. Plaintiffs' motion for partial summary judgment

Next, the Court addresses plaintiffs' motion for partial summary judgment (Doc. 45). Plaintiffs move for summary judgment on the government's mitigation affirmative defense and the government's affirmative defense of contributory


negligence. Plaintiffs argue that any alleged negligence of Patoya cannot reduce CSC's claim unless she was the sole proximate cause of CSC's injuries. Plaintiffs contend that the government has not presented any evidence that Patoya was a proximate cause of CSC's brain injury, let alone the sole proximate cause. Plaintiffs further argue that the only possible basis is an allegation that Patoya in some fashion aggravated her gestational diabetes by maintaining a poor diet in the prenatal period and refused to take insulin when Dr. Bishop suggested it on July 9, 2009. The government counters that there is evidence suggesting that Patoya's own negligence in failing to control her gestational diabetes was a contributing factor of CSC's injuries.

In its answer to the complaint, the government, inter alia, set forth the following affirmative defenses:

> 1. To the extent the plaintiffs failed to mitigate the alleged injuries and damages their recovery should be reduced.
>
> 2. The plaintiffs' recovery should be reduced by the percentage of their own fault in causing the alleged injuries and damages. If it is found that the plaintiffs are more than 50% at fault for the alleged injuries and damages, then they are barred from recovery any damages.
> (Doc. 16. ps. 8-9).

As to the mitigation defense, the government concedes that the evidence does not support such a defense (Doc. 54, p. 7 n. 2). Thus, the Court grants that portion of the plaintiffs' motion for partial summary judgment.

As to the contributory negligence affirmative defense, the Court finds that there are disputes of material fact to preclude summary judgment. The record

contains reports and evidence from both sides regarding the issue of Patoya's gestational diabetes during her prenatal period. As stated previously, plaintiffs' expert Dr. Bryan opined that Dr. Bishop was negligent in his management of Patoya's gestational diabetes which placed her at risk for still birth, placental insufficiency, decreased fetal movement, a large baby and injury to the baby. Also in the record is evidence, that Patoya refused or ignored phone calls from Shawnee Health Services ("SHS") office regarding the results of her first blood glucose test; that after she took the three hour blood glucose test she was ordered by Dr. Sanford to speak with a dietician and that SHS again had trouble contacting Patoya regarding the results and direction. Also the record reveals, that the nutritionist instructed Patoya on a meal plan with low carbohydrates and no sweets and gave her a blood glucose monitor and showed her how to use it. The record states that Patoya may not have been accurately reporting her glucose levels to Dr. Sanford and that she was drinking "regular Kool Aid" and consuming too many carbohydrates. Additionally, the record also reflects that on July 17, 2009, Dr. Bishop examined her, explained the need for glycemic control and insulin as 1st line regimen and that she refused self-injections or to take insulin. Lastly, the record contains an opinion from Dr. Kliman, one of the government's experts, indicating that most likely the cause of CSC's injuries was a cord accident precipitated by CSC's large size and placental insufficiency which stemmed from poor glycemic control. Clearly, there are disputes of material fact as to whether Patoya's own negligence contributed to CSC's injuries alleged in the complaint.

### IV. Conclusion

Accordingly, the Court **DENIES** the government's motion for partial summary judgment (Doc. 43) and **GRANTS in part** and **DENIES in part** plaintiffs' motion for partial summary judgment (Doc. 45). The Court grants summary judgment for the plaintiff on the government's mitigation affirmative defense. Further, the Court **SETS** this matter for Final Pretrial Conference on March 7, 2013 at 3:30 p.m. Also, the parties shall contact Magistrate Judge Williams' chambers if another settlement conference would be beneficial.

**IT IS SO ORDERED.**

Signed this 16th day of January, 2013.

Digitally signed by David R. Herndon
Date: 2013.01.16 11:06:04 -06'00'

Chief Judge
United States District Court