IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| CSC, a minor, by his parents and next friends, PATOYA BRYANT and SEAN COBBS, and PATOYA BRYANT and SEAN COBBS, | ) ) ) ) ) ) | |
| *Plaintiffs*, | ) ) | |
| v. | ) ) | Civil Action No. 10-910-DRH |
| UNITED STATES OF AMERICA, | ) ) | CJRA Track_____ |
| *Defendant.* | ) | |

**FINAL PRETRIAL ORDER**

This matter comes before the Court for Final Pretrial Conference held pursuant to Federal Rule of Civil Procedure 16.

**I.     COUNSEL OF RECORD**

**Plaintiff's Counsel:**

Robert S. Baizer (bob@baizlaw.com)
Joseph E. Kolar (joe@baizlaw.com)
BAIZER KOLAR & LEWIS, P.C.
513 Central Avenue, Suite 500
Highland Park, IL  60035
847-433-6677
847-433-6735 (fax)

**Defendant's Counsel:**

Nathan E. Wyatt (Nathan.Wyatt@usdoj.gov)
Assistant U.S. Attorney
Southern District of Illinois
Nine Executive Drive

1

Fairview Heights, IL 62208
618-628-3700
618-622-3810 (fax)

## II.     NATURE OF THE CASE

This is a medical negligence case involving claims by plaintiffs, Patoya Bryant and Sean Cobbs, that their son Sean suffered a severe brain injury at birth related to an unreasonable delay in his delivery on July 31, 2009.

The United States of America is the only remaining defendant in this case. Plaintiffs' claims against the United States are based on the Federal Tort Claims Act and relate to the conduct of three obstetricians (all deemed federal employees), all of whom provided care to Ms. Bryant at Memorial Hospital of Carbondale on July 30-31, 2009, and prenatally as well.

The United States claims that Sean's brain injury occurred before Ms. Bryant came to the MHC on July 30, 2009. Thus, any alleged negligence by its deemed employees was not a proximate cause of his brain injury.

## III.    JURISDICTION

    A.    This is an action for damages.

    B.    The jurisdiction of the Court is not disputed. This Court has subject matter jurisdiction over the plaintiffs' tort claims against the United States under the Federal Tort Claims Act, 28 U.S.C. § 1346(b).

2

IV. **UNCONTROVERTED FACTS**

The following facts are not disputed or have been agreed to or stipulated to by the parties:

### Obstetricians Involved

1. In July 2009, Donald Bishop, M.D. was a board-certified obstetrician.

2. In July 2009, Akua Afriyie-Gray, M.D. was a board-certified obstetrician.

3. In July 2009, Sridevi V. Panchamukhi, M.D. was a board-certified obstetrician.

4. In July 2009, Dr. Bishop, Dr. Afriyie-Gray and Dr. Panchamukhi all had privileges to practice medicine at Memorial Hospital of Carbondale of Carbondale, Illinois (MHC). They all provided care at MHC to Patoya Bryant.

### Plaintiffs

5. Patoya Bryant (DOB: 1-21-88) and Sean P. Cobbs (DOB: 10-7-85) are the biological parents of Sean (a son). SEAN was born on July 31, 2009, at MHC.

### Admission to MHC

6. Patoya came to MHC at about 2:10 a.m. on July 30, 2009, about 37 weeks pregnant with her first child. Patoya told MHC personnel that since 1:00 a.m., she had noticed decreased fetal movement. (PX1, p. 107)

7. MHC nursing personnel placed an electronic fetal heart rate ("FHR") monitor on Patoya and it started recording her son's heart rate at about 2:23 a.m.

8. At 2:23 a.m., nursing personnel charted that the FHR monitor showed

3

moderate variability, accelerations and no decelerations.

9. At 3:03 a.m. and 3:20 a.m., nursing personnel again charted that the FHR monitor showed moderate variability, accelerations and no decelerations.

10. Dr. Afriyie-Gray reviewed the FHR monitor at 3:15 a.m. At about the same time, Dr. Afriyie-Gray ordered STAT a fetal biophysical profile (BPP) test. The BPP test was performed at 4:18 a.m.

### July 30, 2009, 4:18 a.m. BPP Test

11. A BPP test has four ultrasound components: breathing, body movement, tone and amniotic fluid volume. A fifth component involves a nonstress test of the fetal heart rate.

12. For each component, the fetus receives a score of 2 (normal) or 0 (abnormal). Thus, a perfect score on ultrasound components is 8/8. If the heart rate component is added, a perfect score is 10/10.

13. The recorded result of the 4:18 BPP test was 8/8.

14. About 4:38 a.m., nursing personnel told Dr. Afriyie-Gray the BPP score of 8 out of 8.

### Initial Plan to Send Patoya Home

15. At 4:38 a.m., Dr. Afriyie-Gray wrote the following order: "Pt (patient) may go home. She's to do fetal kick counts. Have her call office today to see if Dr. Bishop wants to see her today or tomorrow." (PX1, p. 115)

16. At 4:42 a.m., Patoya told MHC nurse, Karen Griffin, she did not feel comfortable going home. Nurse Griffin decided to keep Patoya at MHC.

### Continued Observation Early Morning of July 30, 2009

17. At 7:08 a.m., nurse Griffin told Dr. Bishop that Patoya came in for decreased fetal movement and had a BPP with a score of 8/8. (FHR, p. 30).

18. At 7:42 a.m. and 8:30 a.m., nursing personnel charted for the first time that the FHR monitor showed minimal variability and absent accelerations. (FHR, pp. 34 and 40)

19. At 7:56 a.m., Dr. Bishop reviewed the FHR monitor.

20. At about 8:30 a.m., Dr. Afriyie-Gray examined Patoya. After the examination, Dr. Afriyie-Gray wrote a note that provided in part: Normal "BPP but FHT (fetal heart tones) still not reassuring." Dr. Afriyie-Gray decided to admit Patoya for observation and continuous fetal monitoring.

### FHR Monitor on July 30, 2009

21. At 0941, 1030, 1119, 1202 and 1352 on July 30, nursing personnel charted that the FHR monitor showed minimal variability and absent accelerations. (FHR, pp. 48-78)

22. At 1558, 1630 and 1649 on July 30, nursing personnel charted that the FHR monitor showed absent variability and absent accelerations. (FHR, pp. 93-99)

23. The charting for 1558 on July 30 was the first time absent variability was noted by nursing.

24. At 1732 on July 30, nursing personnel charted that the FHR monitor showed absent variability, absent accelerations and late decelerations. (FHR, p. 104)

25. At 1832 on July 30, nursing personnel charted that the FHR monitor showed absent variability and absent accelerations. (FHR, p. 111)

26. At 2000 on July 30, nursing personnel charted that the FHR monitor showed minimal variability, absent accelerations and late decelerations. (FHR, p. 122)

27. At 2100 on July 30, nursing personnel charted that the FHR monitor showed minimal variability and absent accelerations. (FHR, p. 129)

### Dr. Panchamukhi Review of FHR tracing

28. At 2118 on July 30, nursing personnel notified obstetrician Dr. Panchamukhi regarding the FHR tracing. Dr. Panchamukhi reviewed the FHR tracing at about 2119. (FHR, p. 131)

### Continued Nursing Notes of FHR Tracing

29. From 2200 (10:00 p.m.) on July 30 to 0630 on July 31, nurses continued to monitor and chart the FHR. During this time, they made ten entries regarding the FHR. They charted absent variability on seven occasions and minimal variability on three occasions. (FHR, pp. 136-197)

30. From 2200 (10:00 p.m.) on July 30 to 0630 on July 31, nurses charted absent accelerations on eight occasions. They noted a single acceleration on two occasions. (FHR, pp. 136-197)

31. For 0500 on July 31, nurses charted absent variability, absent accelerations and late decelerations. (FHR, p. 186)

32. No doctor saw Patoya from about 8:30 a.m. on July 30 to about 7:10 a.m.

on July 31.

### FHR Baseline

33. At 0303 on July 30, 2009, the baseline FHR was 150 bpm. (FHR, p. 7)

34. At 0941 on July 30, the baseline FHR was 145 bpm. (FHR, p. 48)

35. At 0059 on July 31, the baseline FHR was 140 bpm. (FHR, p. 157)

36. At 0400 on July 31, the baseline FHR was 135 bpm. (FHR, p. 179)

37. At 0600 on July 31, the baseline FHR was 130 bpm. (FHR, p. 193)

38. At 0806 on July 31, the baseline FHR was 122 bpm. (FHR, p. 201)

39. At 0910 on July 31, the baseline FHR was 110 bpm. (FHR, p. 208)

### 2nd BPP Test

40. A second BPP test was completed at about 0710 on July 31, 2009. The score was 2 out of 8.

41. The first BPP test on July 30 and the second test on July 31 were both performed by MHC-employed sonographer, Susan Lingle.

42. At the time of both BPP tests, Ms. Lingle was a Registered Diagnostic Medical Sonographer with the American Registry for Diagnostic Medical Sonography.

### Miscommunication Regarding 2nd BPP Score

43. A nursing note by MHC nurse Erin Shaw provides in part: "Dr. Bishop at bedside. BPP completed. Informed of 2/8 result."

44. Regarding the second BPP score, Dr. Bishop wrote a note at 0730 on July 31, 2009, that provided in part: "FHR c/ (with) absent to minimal variability. BPP 6/10 no breathing."

45. In Dr. Bishop's Operative Report (dictated July 31, 2009) for the cesarean section delivery, he wrote as follows regarding the second BPP score:

> When I arrived at hospital this morning at 6:40 a.m., she was getting the 2nd biophysical profile. The ultrasound tech was still present. I believed that I had been told that the biophysical profile was now 6 of 8 on ultrasound parameters and was 6 of 10 including the nonreactive NST. I was told, "There are no breathing movements," and I thought that there had been points assigned for the parameters of movement, tone, and amniotic fluid volume. However, there was a miscommunication and the actual result on the biophysical was 2 of 10 with no points for fetal movement, breathing or flexion-extension and 2 points for amniotic fluid. Under the assumption that we had a more equivocal situation, I recommended amniocentesis and discussed the risks and benefits in the context of a biophysical profile of 6 of 10.

### Dr. Bishop Examinations After 2nd BPP Test

46. At 0710 on July 31, Dr. Bishop was at the bedside and discussed with Patoya an amniocentesis to assess fetal lung maturity.

47. At about 0720 on July 31, Dr. Bishop was at the bedside and performed an amniocentesis.

48. At about 0817 on July 31, Dr. Bishop was at Patoya's bedside discussing his plan of care for her and her baby.

49. About 0830 on July 31, Dr. Bishop scheduled a cesarean section for noon on July 31. He then returned to his office to see other patients.

50. At about 0910 on July 31, MHC nurse Angela Boatright spoke to Dr. Bishop by phone and gave him an update on the FHR.

51. At about 0922 on July 31, the baseline FHR dropped to about 100 bpm.

52. Shortly before 0924 on July 31, the FHR dropped to about 60 bpm. Dr. Bishop was advised by phone of the drop in the FHR and he ordered a STAT cesarean section delivery.

53. About 0924, the FHR monitor was disconnected and Patoya was taken to an operating room for a cesarean section delivery of her baby.

54. Dr. Bishop rushed back from his office and made the skin incision for the cesarean section at 0936.

55. Sean was born at 0938 on July 31.

## Sean's Apgar Scores

56. An Apgar score describes the condition of a newborn at set times after birth.

57. An Apgar score is based on the following five components: heart rate, respiratory effort, muscle tone, reflex and color. For each component, a newborn can receive a score of 0-2 points. A score of 7 – 10 is considered normal.

58. Sean's Apgar scores were 0 at one minute; 1 at five minutes; and 5 at ten minutes.

59. The 0 score at one minute means Sean had no heart rate, no respirations, limp tone, no reflex response and blue or pale color at that time.

## Test of Cord Blood Gas

60. At birth, blood was drawn from an artery and vein in Sean's umbilical cord and tested by the MHC lab. The cord blood pH was 6.822 (arterial) and 7.077 (venous). At 1013, Sean had a low base excess of -15.

**Prenatal Treatment of Patoya Bryant's Gestational Diabetes**

61. On May 14, 2009, Dr. Bishop gave Patoya a 1-hour gestation diabetes screen with a result of 157 (normal 65-139).

62. On June 10, 2009, Dr. Bishop gave Patoya a glucose tolerance test (GTT). A GTT is a lab test to check how a person's body breaks down sugar. A GTT is one test used to determine if a person has diabetes.

63. Patoya's GTT results were:

Glucose fasting: 255H (65-95)
1 hour: 357H (65-180)
2 hour: 355H (65-155)
3 hour: 340H (65-140)

64. On July 12, 2009, a urinalysis test for Patoya revealed a glucose level of 300 and ketone of 5.

65. The GTT and urinalysis test results confirmed Patoya was a gestational diabetic.

66. On July 17, 2009, Dr. Bishop discussed insulin with Patoya versus glyburide for treatment of her gestational diabetes. Glyburide is a pill which is an alternative to insulin shots.

67. Dr. Bishop's note of his July 17 visit with Patoya provides:

"Explained need for glycemic control + insulin as 1st line regimen. Unwilling to give self injections or take them. Discussed glyburide as possible alternative. Expect better glycemic control c/ pt. being compliant on glyburide vs noncompliant on insulin. Start 5mg dly." (SWH22)

68. After July 17, Patoya took glyburide.

10

69. After Patoya was admitted to MHC on July 30, 2009, she received insulin shots from MHC personnel.

## V. **AGREED TO ISSUES OF LAW**

The parties agree that the following are the issues to be decided by the Court:

1. Did Dr. Bishop and/or Dr. Afriyie-Gray and/or Dr. Panchamukhi violate the standard of care for an obstetrician?

2. If the answer to issue 1 is affirmative, were any violations of the standard of care by Dr. Bishop and/or Dr. Afriyie-Gray and/or Dr. Panchamukhi a proximate cause of Sean's permanent brain injury?

3. If the answers to issues 1 and 2 are affirmative, what is the amount of money which will reasonably and fairly compensate Sean for the elements of damages listed in section VIII of this order?

4. Defendant has raised an affirmative defense of contributory negligence regarding Patoya Bryant's role in controlling her gestational diabetes.

Plaintiffs view this issue as follows: "Was Patoya Bryant the sole proximate cause of Sean's permanent brain injury?"

Defendant views this issue as follows: "Did Patoya Bryant's own negligence contribute to Sean's injuries?"

The parties disagree whether the conduct of Patoya Bryant, who is suing in a representative capacity, can be used to reduce Sean's recovery in this case (as defendant argues) or whether her conduct must be the sole proximate cause of Sean's injuries (as plaintiff argues) .

**VI.** **<u>WITNESSES</u>**

A. List of witnesses the plaintiffs expect to call, including experts.

Parties, Employees of Parties and Deemed Employees

| Patoya Bryant | Mother |
| Sean Cobbs | Father |
| Donald Bishop, M.D. | Obstetrician (Deemed federal employee) |
| Akua Afriyie-Gray, M.D. | Obstetrician (Deemed federal employee) |
| Sridevi V. Panchamukhi, M.D. | Obstetrician (Deemed federal employee) |

I. Expert witnesses
(FRCP 26(a)(2)(B) expert witnesses)

| Theonia K. Boyd, M.D. Boston, MA | Placental pathologist |
| Richard Boyer, M.D. Salt Lake City, Utah | Pediatric neuroradiologist |
| Bruce Bryan, M.D. St. Louis | Obstetrician |
| Charles Dietzen, M.D. Zionsville, IN | Pediatric physical medicine and rehabilitation |
| Harlan R. Giles, M.D. Pittsburgh, PA | Obstetrician/Maternal Fetal Medicine |
| Stephen Glass, M.D. Seattle, WA | Pediatric neurology |
| Charles M. Linke, Ph.D. Champaign, IL | Economist |
| Michelle L. Murray, Ph.D., RNC Albuquerque, NM | Labor and delivery nursing & fetal heart rate monitoring |
| Jan Klosterman, RN St. Louis | Life care planner |
| Thomas Sullivan, Ph.D. Fairfield, OH | Pediatric neuropsychologist |

2. Non-expert witnesses.
(FRCP 26(a)(2)(C) witnesses)

| | |
|---|---|
| Teresa Sykes | Patoya Bryant's mother |
| Valesta Cobbs | Father Sean Cobbs' mother |
| Erin Shaw | MHC labor and delivery nurse |
| Angela Boatright | MHC labor and delivery nurse |
| Susan Lingle | Ultrasound technician at MHC |
| Sandra Fark<br>Murphysboro, IL | Sean's development therapist |
| Mindy Birkner<br>Carlyle, IL | Sean's occupational therapist |
| Gail M. Durkota<br>Carbondale, IL | Sean's speech therapist |
| Jacqueline Gomes<br>Carbondale, IL | Sean's physical therapist |
| Jacqueline A. Wade<br>Carbondale, IL | Sean's speech therapist |
| Sadie A. Hunsaker<br>Carbondale, IL | Sean's speech therapist |
| Nicole D. Roach<br>Carbondale, IL | Sean's physical therapy assistant |
| Linda A. Bunselmeyer<br>Carbondale, IL | Sean's occupational therapist |
| Cirilo Sotelo-Avila, M.D.<br>St. Louis | Pathologist<br>(placental pathology) |

B. List of witnesses defendant expects to call, including experts:

1. Parties and Deemed Employees

| | |
|---|---|
| Patoya Bryant | Mother |
| Sean Cobbs | Father |
| Donald Bishop, M.D. | Obstetrician (deemed employee) |
| Akua Afriye-Gray, M.D. | Obstetrician (deemed employee) |
| Sridevi V. Panchamukhi, M.D. | Obstetrician (deemed employee) |

2. Expert witnesses.

| Allison Cahill, M.D.<br>St. Louis, MO | Obstetrician/Maternal Fetal Medicine |
|---|---|
| Harvey J. Kliman, M.D.<br>Woodbridge, CT<br>(by deposition) | Pathology |
| Gordon Sze, M.D.<br>New Haven, CT<br>(by deposition) | Neuroradiology |
| Thomas R. Ireland<br>St. Louis, MO | Economist |
| Shay Jacobson, RN<br>Burr Ridge, IL | Life care planner |

3. Non-expert witnesses.

| Thomas Geller | Pediatric Neurology (treating); Cardinal Glennon Children's Hospital |
|---|---|
| Erin Shaw | MHC Nurse |
| Angela Boatright | MHC Nurse |
| Susan Lingle | MHC Nurse |

[C. Rebuttal Witnesses. The plaintiff may call rebuttal witnesses and the defendant may call sur-rebuttal witnesses as may be necessary, without prior notice thereof to the other party.]

## VII. EXHIBITS

See attached Exhibit Stipulation.

**VIII.	DAMAGES**

| Plaintiffs' Itemized Statement of All Damages | | |
|---|---|---|
| Element | Lower bound | Upper bound |
| *Diminished earnings capacity* (High school education) *or* | $1,416,203 | $2,131,884 |
| (College education) | $2,586,385 | $3,964.866 |
| *Life care plan* (Home Care) *or* | $10,312,607 | $15,155,881 |
| (Facility Care) | $7,841,243 | $11,099.750 |
| Disfigurement | | |
| Disability or loss of normal life | | |
| Past and future pain and suffering | | |

**The Defendant disputes these damages.**

**IX.	BIFURCATED TRIAL**

The parties do not want a bifurcated trial.

**X.	TRIAL BRIEFS**

Trial briefs will be filed no later than June 15, 2013.

**XI.	LIMITATIONS, RESERVATIONS AND OTHER MATTERS**

A.	**Trial Date.**  Trial is set for the week of July 15, 2013.

B.	**Length of Trial**. The probable length of trial is 10 days. The case will be listed on the trial calendar to be tried when reached. The case will be a bench trial.

C.	**Number of Jurors.** Not applicable.

D. **Voir Dire.** Not applicable.

E. **Motions in Limine.** Motions in limine shall be filed no later than twenty (20) days before the Final Pretrial Conference. Responses, if any, shall be filed within ten (10) business days thereafter. Oral argument on motions in limine will only be allowed in exceptional circumstances and will be scheduled when the Court's calendar permits. Due to the nature of motions in limine, failure to file said motions by this deadline generally will not prejudice a party's ability to move in limine prior to the jury's impanelment. Later-filed motions, however, may be stricken if their consideration would delay the timely start of the trial.

F. **Jury Instructions.** Not applicable.

**IT IS ORDERED** that the Final Pretrial Order may be modified at the trial of the action, or prior thereto, to prevent manifest injustice or for good cause shown. Such modification may be made either on motion of counsel or *sua sponte* by the Court.

DATED: March 7, 2013

Digitally signed by David R. Herndon
Date: 2013.03.07 15:34:28 -06'00'

DAVID R. HERNDON, CHIEF JUDGE
UNITED STATES DISTRICT COURT

APPROVED AS TO FORM AND SUBSTANCE:

s/Robert S. Baizer
s/Joseph E. Kolar
_____
ATTORNEY FOR PLAINTIFFS

s/Nathan E. Wyatt
_____
ATTORNEY FOR DEFENDANT

**NOTE:** This order should be submitted as a proposed order directly to chambers (DRHpd@ilsd.uscourts.gov) with counsel's s/ signatures provided.

17