IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

CSC, a minor, by his parents and next
friends, PATOYA BRYANT and SEAN
COBBS, and PATOYA BRYANT and
SEAN COBBS,

     **Plaintiffs,**

   *v.*       Civil No.  10-910-DRH

UNITED STATES OF AMERICA,

     **Defendant.**


## MEMORANDUM AND ORDER


**HERNDON, Chief Judge:**


## FINDINGS OF FACT AND CONCLUSIONS OF LAW


### I.  INTRODUCTION & BACKGROUND

On November 10, 2010, plaintiffs filed a fourteen-count complaint against defendants United States of America, Southern Illinois Hospital Services (d/b/a Memorial Hospital of Carbondale) and two nurses who worked at Memorial Hospital of Carbondale ("MHC").  Plaintiffs claimed that negligence by defendants (or their agents) before Sean Cobbs' birth on July 31, 2009, caused his

permanent brain injury.  Plaintiffs filed this case pursuant to the Federal Tort Claims Act, 28 U.S.C. 2671 *et. seq*.  Counts 1- 6 alleged negligence and family expense claims against the United States for the conduct of Donald Bishop, M.D., Akua Afriyie-Gray, M.D. and Sridevi Panchamukhi, M.D.  Dr. Bishop, Dr. Afriyie-Gray and Dr. Panchamukhi are all board certified obstetricians.  (FPO, ¶¶1-3)[1] Counts 7-14 alleged claims against MHC nurses Erin Shaw and Angela Boatright and MHC for the conduct of the nurses.

On June 28, 2012, this Court approved a settlement between SIHS and plaintiffs (Doc. 58).  This case proceeded to trial on July 15, 2013, against the United States (for the conduct of the three doctors).

---

[1] "FPO" is the citation to the Final Pretrial Order dated March 7, 2013 (Doc. 69).

## Uncontested and Uncontroverted Facts

1.      At about 2:10 a.m. on July 30, 2009, Patoya Bryant (DOB: 1-21-88) came to MHC about 37 weeks pregnant with her first child.  Patoya presented with a "complaint of decreased fetal movement since approximately 1 a.m. on 07/30/2009." (PTX 1, p. 85; FPO, ¶6)[2]

2.      MHC nursing personnel placed an external electronic fetal heart rate ("FHR") monitor on Patoya and it started recording her son's heart rate at about 2:23 a.m.  (FPO, ¶7)  At 2:23 a.m., nursing personnel charted that the FHR monitor showed moderate variability, accelerations and no decelerations.  (FPO, ¶8)  At 3:03 a.m. and 3:20 a.m., nursing personnel again charted that the FHR monitor showed moderate variability, accelerations and no decelerations.  (FPO, ¶9)

3.      Numerous witnesses testified that moderate variability of the FHR, accelerations of the FHR and the absence of FHR decelerations are all reassuring FHR patterns.  These patterns indicated Sean was not in distress at that time from inadequate oxygen.

4.      Dr. Afriyie-Gray reviewed the FHR monitor at 3:15 a.m.  At about the same time, Dr. Afriyie-Gray ordered a STAT fetal biophysical profile (BPP) test. The BPP test was performed at 4:18 a.m.  (FPO, ¶10)

5.      A BPP test is an ultrasound examination of a fetus.  It is a test of fetal well-being.  A BPP has four ultrasound components:  breathing, body movement,

---

[2] "PTX" refers to Plaintiffs' trial exhibits admitted at trial.

tone and amniotic fluid volume.  A fifth component involves a non-stress test of the fetal heart rate.  (FPO, ¶11)  For each component, the fetus receives a score of 2 (normal) or 0 (abnormal).  Thus, a perfect score on ultrasound components is 8/8.  If the heart rate component is added, a perfect score is 10/10.  (FPO, ¶12)

6.     The recorded result of the 4:18 a.m. BPP test was 8/8.  (FPO, ¶13)  A valid BPP result of 8/8 is considered "highly reassuring" for the health of the fetus.  (PTX 25, p. 5).

7.     There was a great deal of evidence and testimony regarding the validity of the 4:18 a.m. BPP test result of 8/8.  In its opening statement, the United States conceded that if the BPP result was valid, then Sean did not have a brain injury when Patoya came to the hospital on July 30.  However, the United States claims the BPP result was not a valid score because Patoya's abdomen was manipulated before the test commenced.  As will be developed hereafter, the Court disagrees and finds to the contrary.

8.      At 4:38 a.m., Dr. Afriyie-Gray wrote the following order:  "Pt (patient) may go home.  She's to do fetal kick counts.  Have her call office today to see if Dr. Bishop wants to see her today or tomorrow."  (FPO, ¶15)  However, shortly thereafter, Patoya told MHC nurse, Karen Griffin, she did not feel comfortable going home.  Nurse Griffin decided to keep her at MHC.  (FPO, ¶16)

9.     At 7:08 a.m., nurse Griffin told Dr. Bishop that Patoya came in for decreased fetal movement and had a BPP with a score of 8/8.  (FPO, ¶17).  At 7:42 a.m. and 8:30 a.m., nursing personnel charted for the first time that the FHR

4

monitor showed minimal variability and absent accelerations. (FPO, ¶18) At 7:56 a.m., Dr. Bishop reviewed the FHR monitor. (FPO, ¶19)

10.    At about 8:30 a.m., Dr. Afriyie-Gray examined Patoya. After the examination, Dr. Afriyie-Gray wrote a note that provided in part: Normal "BPP but FHT (fetal heart tones) still not reassuring." Dr. Afriyie-Gray decided to admit Patoya for observation and continuous fetal monitoring. (FPO, ¶20)

## Obstetricians Plan of Care Discussion Morning of July 30, 2009

11.    About 9:00 a.m. on July 30, 2009, obstetricians Dr. Afriyie-Gray, Dr. Bishop and Dr. Keith Stanford met and discussed a plan of care for Patoya. At this time, Dr. Bishop was chief of the obstetric service at MHC. (Dr. Bishop video admission, Tr. p. 7). During their meeting, they discussed the 8/8 BPP score. During the meeting, Dr. Bishop was of the opinion that Patoya's baby should be delivered. He admitted:

> Q.    So you're saying the morning of July 30, you held a different opinion regarding the plan of care than Dr. Afriyie-Gray?
> A.    Yeah, we had different opinions. I wouldn't say that she was absolutely wrong, I wouldn't say that I was absolutely right,    but we had different opinions.
> Q.    But the morning of July 30, was it your opinion that the baby  should be delivered?
> A.    Yes.

(Dr. Bishop video admission, Tr. p. 52). However, the three doctors decided to let the pregnancy continue. Dr. Afriyie-Gray wrote that the plan was to "admit for

observation/monitoring." (PTX 1, p. 108)  After this meeting the morning of July 30, no doctor saw Patoya again until about 7:10 a.m. the next day.  (FPO, ¶32)

**FHR Monitor Strip Pattern after Physician Meeting on July 30, 2009**

12.   MHC nursing personnel continued to follow the FHR on July 30 and 31.  From 9:41 a.m. on July 30 until the FHR monitor was disconnected for the emergency cesarean section, the strip showed minimal to absent variability. (FPO, ¶¶21-31).  During this same time period, the FHR pattern included some late decelerations and two accelerations.  (FPO, ¶¶21-31)

13.   The FHR tracing also reported Sean's baseline heart rate.   The nurses charted the FHR baseline as follows (FPO, ¶¶33-39 and 51):

A.    150 bpm:  0303 on July 30

B.    145 bpm:  0941 on July 30

C.    140 bpm:  0059 on July 31

D.    135 bpm:  0400 on July 31

E.    130 bpm:  0600 on July 31

F.    122 bpm:  0806 on July 31

G.    110 bpm:  0910 on July 31

H.    100 bpm:  0922 on July 31

It is clear that this steady decline in the FHR baseline was evidence of Sean losing reserves in the womb from progressive oxygen deprivation.

6

14.    All expert witnesses and MHC nursing personnel testified that the FHR pattern was nonreassuring after the 9:00 a.m. meeting on July 30 and remained so until it was disconnected for the emergency cesarean section.

### Dr. Panchamukhi's Review of FHR Strip Evening of July 30, 2009

15.    At 4:49 p.m. and 5:32 p.m. on July 30, obstetrician Dr. Panchamukhi reviewed the FHR strip.  (PTX 3, pp. 99 and 104; Angela Boatright video testimony, dep. 39-40).  At about 9:18 p.m. on July 30, nursing personnel notified obstetrician Dr. Panchamukhi about the non-reassuring FHR tracing.  Dr. Panchamukhi reviewed the FHR tracing again at about 9:19 p.m.  (FPO, ¶28).  She took no steps to deliver Sean herself or call Dr. Bishop to deliver Sean.  At the request of nurse Erin Shaw, Dr. Panchamukhi ordered a repeat BPP test for the morning of July 31.  (PTX 1, p. 119)  A repeat BPP had been ordered by Dr. Afriyie-Gray for "48 hrs" after the first test.  (PTX 1, p. 116)

### 2nd BPP Test

16.    The BPP test ordered by Dr. Panchamukhi was completed at about 7:10 a.m. on July 31, 2009.   It was also performed by MHC-employed

sonographer, Susan Lingle.  (FPO, ¶41)  The score was 2 out of 8.  (FPO, ¶40)

Such a score requires immediate delivery of a baby.  (PTX 25, p. 6).

17.   Dr. Afriyie-Gray and plaintiffs' obstetrical experts, Dr. Harlan Giles

and Dr. Bruce Bryan, all testified that Sean's BPP score of 2/8 required his

immediate delivery.   Even defendant's obstetrical expert, Dr. Allison Cahill,

testified the score of 2/8 mandated immediate delivery of Sean.

### Dr. Bishop's "Assumption" the Score was 6/8

18.   At 0710 on July 31, 2009, Nurse Erin Shaw wrote the following note:

"Dr. Bishop at bedside.  BPP completed.  Informed of 2/8 result."  (FPO, ¶43)

However, regarding the second BPP score, Dr. Bishop wrote a note at 0730 on

July 31, 2009, that provided in part:  "FHR c/ (with) absent to minimal variability.

BPP 6/10 no breathing."  (FPO, ¶44)

19.   No one ever told Dr. Bishop the score was 6/8.  Instead of asking

nurse Shaw or Ms. Lingle the actual score, Dr. Bishop made an "assumption" the

score was a 6/8.   This "assumption," made without any apparent basis, is

described by Dr. Bishop in his operative report as follows:

> When I arrived at hospital this morning at 6:40 a.m., she was getting
> the 2nd biophysical profile.  The ultrasound tech was still present.  I
> believed that I had been told that the biophysical profile was now 6 of
> 8 on ultrasound parameters and was 6 of 10 including the
> nonreactive NST.  I was told, "There are no breathing movements,"
> and I thought that there had been points assigned for the parameters
> of movement, tone, and amniotic fluid volume.  However, there was a
> miscommunication and the actual result on the biophysical was 2 of
> 10 with no points for fetal movement, breathing or flexion-extension

8

and 2 points for amniotic fluid. *Under the assumption* that we had a more equivocal situation, I recommended amniocentesis and discussed the risks and benefits in the context of a biophysical profile of 6 of 10.

(FPO, ¶45)(emphasis added)

20.     Even though the FHR strip had been non-reassuring all night and even with (in his mind) a 6/8 BPP score in a woman with gestational diabetes, Dr. Bishop decided to let the pregnancy continue.  Moreover, he did an amniocentesis around 7:30 a.m. to evaluate Sean's lungs, while his brain was getting inadequate oxygen.  (PTX 1, pp. 108-109).

21.     Dr. Bishop reviewed the FHR strip at 6:40 a.m., 8:06 a.m., 8:17 a.m. and 8:30 a.m. and then scheduled a cesarean section for noon on July 31.  (PTX 4, pp. 14-15; Angela Boatright video testimony, dep. 43-44).  Despite these mounting and more than significant problems, Dr. Bishop then went to his office to see other patients that morning.

22.     In an attempt to help Sean, nurse Boatright gave Patoya oxygen at 9:10 a.m.  (PTX 4, p. 16).  She also called Dr. Bishop and gave him an update on the FHR strip, which continued its drop in baseline.  (PTX 4, p. 16).

23.     As one would expect, Sean's heart rate continued to drop.  At about 9:23 a.m., it crashed to 60 beats per minute.  (PTX 3, p. 210).  Patoya  was rushed to a delivery room for an emergency cesarean section.

9

24.     Sean was delivered lifeless at 9:38 a.m.  He had no heart rate, no respirations, no reflex response, flaccid tone and blue color.  (PTX 1, p. 81)  He had a one-minute Apgar score of 0 (0-10 scale).  (PTX 1, p. 81).

25.     Medical and nursing personnel began resuscitation of Sean.  He received chest compressions for 10 minutes.  He was intubated and received epinephrine, a heart stimulant drug.  (PTX 1, p. 82)  Their heroic efforts saved Sean's life.  However, as noted below, he had a severe brain injury from oxygen deprivation before his birth.  The record is replete with medical evidence and testimony that this brain injury caused severe disfigurement and much pain and suffering for Sean. It has dramatically degraded his intellectual, adaptive, attention, language, gross motor and fine motor functioning.  A few of the disfigurements include his awkward gait, pronation of the feet, a microcephalic head, his left arm that requires a brace and hangs like a "chicken wing," and his left leg which is crooked and also requires a brace and his constant drooling.  His parents testified that he, still at age four, wears a diaper and always will, that he spits when he is angry, mad and excited and that he wears eye glasses that are hard to keep on him.  Further, he associates the tooth brush with pain and he extremely dislikes the eye drops that are required every morning and evening.

## II.     FINDINGS

### Standard of Care

10

26.    Dr. Bishop, Dr. Afriyie-Gray and Dr. Panchamukhi all violated the standard of care.  Dr. Bryan and Dr. Giles detailed the violations of the standard of care.  The United States' only obstetrical expert, Dr. Cahill, offered no opinions on the standard of care of the three physicians during the admission at MHC, presumably because she believed they violated the standard of care (as detailed by Dr. Bryan and Dr. Giles).

27.    Dr. Bishop took the stand at trial.  He did not even testify that he complied with the standard of care in his handling of Patoya in the hospital.

28.    Dr. Bishop, Dr. Afriyie-Gray and Dr. Panchamukhi violated the standard of care as follows:

> A.    Dr. Bishop and Dr. Afriyie-Gray by failing to take steps to deliver Sean the morning of July 30, following their plan of care meeting.  This violation was continuing for the next approximately 24 hours;

> B.    Dr. Panchamukhi failed to deliver Sean the evening of July 30 or contact Dr. Bishop and demand that he deliver Sean that evening;

> C.    Dr. Bishop by failing to find out the actual BPP score of 2/8 and instead making an "assumption" the score was 2/8;

> D.    Dr. Bishop by failing to perform an emergency C-Section around 7:30 a.m., even with his "assumption" the BPP score was 6/8; and

> E.    Dr. Bishop by further delaying Sean's delivery to do an amniocentesis around 7:30 a.m. on July 31.

**Causation**

11

**(Type of Sean's Brain Injury)**

29.     The Court concludes, based on all the evidence at trial, that Sean suffered a hypoxic-ischemic brain injury.   This is a brain injury from oxygen deprivation to the brain.   It is also called hypoxic ischemic encephalopathy ("HIE").

30.     There is no credible evidence or reasonable inference that Sean suffered a brain injury from any other cause, such as infection, blood disorder or a genetic disorder.

31.     Even Sean's treating doctors at Cardinal Glennon Children's Hospital concluded Sean had a HIE brain injury.   For example, pediatric neurologist Dr. Thomas Geller wrote on April 8, 2011:  "Pt is a 20 month old male with history of Hypoxic-Ischemic encephalopathy at birth . . . ."   (PTX 41, p. 30).   Dr. Sean Goretzke, a pediatric neurologist from the Cardinal Glennon cerebral palsy clinic, wrote on March 17, 2011:  "CP secondary to perinatal hypoxic ischemic injury."  (PTX 42, p. 2).  In lay terms, this means Sean's cerebral palsy occurred around birth (perinatal) from oxygen deprivation to his brain.

**Patoya's Complaint of Decreased Fetal Movement**

32.     Patoya came to MHC at 2:10 a.m. on July 30, 2009, with a "complaint of decreased fetal movement since approximately 1 a.m. on July 30,

2009." (PTX 1, p. 85) The government portrays this complaint as the equivalent of fetal demise.  However, its own deemed-employee, Dr. Afriyie-Gray, provided the following video testimony at trial:

> Q.   And why did you at that time, 04:38, give a telephone order that Patoya may go home?
>
> A.   It's standard practice.  *Essentially people come in with decreased fetal movement all the time*, and that's at many different gestational ages.  If the  strip is -- sometimes even if the strip is perfect, we order a BPP, because it reassures the patient in seeing their baby moving. And so once this is done, typically that's enough for us to understand that the baby is alive and well, and we can discharge the patient home.  At that time, I don't understand that she had any other complaints, and so I discharged her home.
>
> Q.   And your telephone order that Patoya may go home, that's, I guess, further evidence of your confidence at that time in the eight out of eight  BPP score; correct?
>
> A.   Yes.  But I'm a little bit conservative. Because it wasn't ten out of ten, my intention was for her to follow up with her primary obstetrician the next day and perhaps even repeat the test if necessary.  So that's why I have on the order to call the office that day and see if her primary physician would like to see her within that day or the next day. And I also instructed her to do fetal kick counts and monitor the movement for herself in the interim.
>
> Q.   I understand.  But at this point, if you had any concern about fetal well-being, you would not have given the telephone order for Patoya to go home; correct?
>
> A.   Of course.

(Dr. Afriyie-Gray video admission, Tr. pp. 37-38)(emphasis added).  Indeed, all experts agreed that complaints of decreased fetal movement are common.

## Causation
### (Timing of Sean's Brain Injury)

33.     It is also agreed that Sean's brain injury did not occur months or even weeks before his birth.  The United States claims the HIE injury occurred in the few days before Patoya came to the hospital on July 30, 2009.   However, except for a "cord accident" theory offered by Dr. Harvey Kliman, the United States never identified a specific event that occurred during the three day period before Patoya's admission on July 30 that could account for Sean's devastating brain injury. The lack of such a specific event does not give the Kliman theory credence.

34.     Of important note, none of the experts called by the United States testified that the events that occurred in the last 45 minutes before Sean was born did not contribute to (i.e. was not a proximate cause of) his brain injury.

35.     The plaintiffs' experts uniformly testified that Sean's severe brain injury occurred exclusively or almost exclusively (Dr. Stephen Glass) in the last 45 minutes before his birth.

## Review of Opinion Testimony on Timing of Injury

36.     Dr. Stephen Glass of Seattle, Washington, is a pediatric neurologist who testified for plaintiffs.   Pediatric neurology involves the diagnosis of and treatment of newborn and pediatric brain injuries.  Since Dr. Glass was *the only*

14

pediatric neurologist to testify in this case, the Court gives particular attention to his testimony.   In this particular instance, the Court found the testimony to be credible and quite helpful in assessing the facts and making conclusions.

### Plaintiffs' Witnesses on Timing of Injury

37.     As plaintiffs' first witness of the trial, Dr. Glass testified at length regarding his "differential etiology" for determining the type and timing of Sean's brain injury.  This type of analysis by Dr. Glass fully comports with Rule 702 of Federal Rules of Evidence.  *Schultz v. Akzo Nobel Paints, LLC*, 721 F.3d 426 (7th Cir. 2013).

38.     Dr. Glass opined that Sean's injury occurred in the last nine hours before his birth, most likely occurring almost exclusively in the last 45 minutes before his birth.   The bases for Dr. Glass' opinion (without contradiction by another pediatric neurologist) were as follows:

> A.     Sean maintained his FHR base line until around 9:10 a.m. when it began to precipitously drop, crashing to 60 bpm at 9:23 a.m.

> B.     Sean had severe metabolic acidosis at birth, as evidenced by his arterial blood gas pH of 6.822 and his base deficit of - 15.   This degree of acidosis is not compatible with life and thus could not have been going on for more than an hour.

> C.     The difference between Sean's arterial pH (6.822) and venous pH (7.07) point to a recent hypoxic-ischemic event because the body did have time to equalize the pH values.

      D.     Sean was capable of resuscitation.  The fact personnel could resuscitate Sean points to a recent hypoxic-ischemic event because if it had been long standing Sean would have died.

      E.     Mild injury to Sean's other organs point to an insult near birth as opposed to days before birth.

39.    Dr. Glass testified that Sean meets the four "essential criteria" published by the American College of Obstetricians and Gynecologists ("ACOG") and the American Academy of Pediatrics ("AAP") as "sufficient" to conclude cerebral palsy was caused at or around the time of birth.  This document, which the United States cited as well, is titled *Neonatal Encephalopathy and Cerebral Palsy:  Defining the Pathogenesis and Pathophysiology.*"  ("NEACP")(*See* list of NEACP "essential criteria" on attached PTX 113).

40.    Dr. Glass explained that the NEACP document was published by ACOG and AAP to set a high medical hurdle for parents to prove their child's injury was caused by events around birth.  Despite the biased nature of the NEACP, Dr. Glass testified that Sean nonetheless met the "essential criteria."

41.    Dr. Bruce Bryan, plaintiffs' obstetrical expert, testified that the injury occurred in the last 45 minutes before Sean was born.  He testified that from a clinical perspective, all evidence points to this time period when Sean's heart rate dropped, he was born lifeless, he had extremely low Apgar scores and severe metabolic acidosis.

16

42.     Dr. Harlan Giles, plaintiffs' maternal fetal medicine expert, testified the injury occurred in the last 45 minutes before Sean's birth.   Dr. Giles testimony is very persuasive because of his many years in practice and because he is a geneticist as well.  Like Dr. Glass, Dr. Giles testified the heart rate crash, the metabolic acidosis (in particular the arteriovenous pH difference), the Apgar scores and the fact Sean could be resuscitated all point directly to the last 40 minutes as when Sean's injury occurred.

43.     Dr. Richard Boyer from Utah testified for plaintiffs.  He is a pediatric neuroradiologist.  He was the only board certified pediatric radiologist to testify in the case.

44.     Dr. Boyer testified that, based only on Sean's ultrasound of his brain on August 3, 2009 (and excluding all other information), his injury occurred one to seven days before August 3, 2009.   Dr. Boyer explained that in his daily practice at the only children's hospital in Utah and several surrounding states, he meets with clinicians (pediatric neurologists, maternal fetal medicine doctors) and parents to discuss the causes of newborn brain injuries.  He testified that brain images must be correlated with the clinical record.  Here, after doing a clinical correlation, Dr. Boyer testified that Sean's brain injury clearly occurred in the last 45 minutes before birth and the 10-15 minutes after birth.

45.     Dr. Boyer was the only witness to address the minutes after birth as contributing to Sean's injury.   His persuasive testimony would appear corroborated by the resuscitation record which clearly shows chest compressions

17

were performed for 10 minutes and Sean required epinephrine to stimulate his heart. (PTX 1, p. 82). There is no question that Sean's brain did not receive adequate oxygen after birth because of the horrendous care he received before birth.

## United States' Witnesses on Timing

46. Dr. Gordon Sze, a neuroradiologist from Yale, testified for the United States by video tape. Unlike Dr. Boyer (plaintiffs' neuroradiologist), Dr. Sze is not board certified in pediatric radiology. (Dr. Sze video testimony, Tr. p. 81).

47. Dr. Sze based his timing opinion solely on the size of the lateral ventricles on the August 3, 2009 ultrasound of Sean's head. Although he reviewed all the clinical records in this case and admitted he has performed clinical correlations in the past, he refused to perform a clinical correlation in this case and instead "deferred" to the clinicians.

48. Based only on the size of the lateral ventricles, Dr. Sze opined Sean's injury occurred "approximately" four to seven days before the August 3, 2009, ultrasound.

49. Based on his "ventricle" analysis, Dr. Sze admitted that Sean's injury could have occurred around 2:00 p.m. on July 30. (Dr. Sze video testimony, Tr. p. 62). He admitted it was "less likely," but the injury could have occurred at 4:00 p.m. on July 30. (Dr. Sze video testimony, Tr. p. 62). Thus, Dr. Sze's testimony places the timing of Sean's brain injury as late as seven hours after the standard of care required his delivery.

18

50.     Dr. Sze made two admissions which undermine his testimony that a baby always has compressed lateral ventricles about three days following a partial prolonged HIE injury.  First, he was asked this question:  "Do you agree that in timing an injury based on ventricle size on an ultrasound exam, a neuroradiologist has to be careful because ventricle size can vary?"  Dr. Sze answered:  "Sure, ventricle sizes can vary, yes."  (Dr. Sze video testimony, Tr. p. 68-69).

51.     Second, on direct examination, Dr. Sze testified "[t]his is a *moderate case* of hypoxic-ischemic injury.  If it had been very severe, you would have seen even more loss of brain tissue and even larger ventricles."  (Dr. Sze video testimony, Tr. p. 32)  Still on direct examination, he testified:  "The ventricles are always compressed in partial prolonged hypoxic-ischemic injury that's *significant* (as opposed to moderate)."  (Dr. Sze video testimony, Tr. p. 33)  To prove this was not a slip or misstatement by Dr. Sze, he testified again on direct:  "And certainly, the amount of swelling in a *significant case* (versus moderate) of partial prolonged hypoxic-ischemic injury results in ventricular compression."  (Dr. Sze video testimony, Tr. p. 35-36)

52.     Dr. Sze's admissions on direct examination correlate with Dr. Boyer's testimony that the ventricles are not always compressed following a partial prolonged HIE injury.  Moreover, if compressed, not all babies have edema and resolution of the edema at the same rate.

19

53.     Furthermore, Dr. Sze agreed with this statement:  "Since every baby is different, brain imaging findings must be interpreted in the context of the clinical record."  (Dr. Sze video testimony, Tr. p. 74)   Regarding the clinical information of Sean being born with no heart rate, no respirations, blue in color, a cord arterial blood pH of 6.82, Dr. Sze testified he "would be concerned" that Sean's injury occurred close to birth.  (Dr. Sze video testimony, Tr. p. 75-76).

54.     Finally, based on Sean suffering a partial prolonged HIE injury, Dr. Sze was asked if his brain injury could have occurred in the last 45 minutes before his birth.   Dr. Sze agreed, and testified:  "That is correct."  (Dr. Sze video testimony, Tr. p. 46)

55.     The United States also called as a witness Dr. Harvey Kliman regarding the timing of Sean's injury.  Dr. Kliman is a "research scientist" working at Yale.   He overstated his qualifications on direct examination.   On cross examination, it was revealed that in 1995 Dr. Kliman was asked to leave the Yale Department of Pathology, where he was an assistant professor.   He was then demoted to "research scientist."   In the eighteen years following his departure from the department of pathology, Dr. Kliman was never even promoted to the rank of "Senior Research Scientist", even though Yale written policy required such a review every five years.

56.     Dr. Kliman testified that "meconium laden macrophages" on the placenta and elevated nucleated red blood cells point to a "cord accident" occurring 72-96 hours before Patoya came to the hospital.  Of note, he testified

the "cord accident" caused an acute deprivation of oxygen which caused Sean's brain injury. Dr. Kliman's "acute cord accident" hypothesis is completely contrary to all the neuroradiology testimony in this case. Both Dr. Boyer (for plaintiff) and Dr. Sze (for defendant) testified that with an acute hypoxic-ischemic event, the basal ganglia and thalami of the brain are injured. These parts of Sean's brain, though, were not injured. Thus, Sean could not have suffered an acute brain injury as theorized by Dr. Kliman.

57.     Even taking Dr. Kliman's theories for what they are worth (which Cardinal Glennon placental pathologist Dr. Cirilo Sotelo-Avila opined was "not much"), Dr. Kliman testified that the drop in Sean's heart rate to 60 beats per minute, followed by his birth with no heart rate, was a "sentinel" event of which he would be concerned as causing the brain injury.

58.     Two very credible witnesses refuted Dr. Kliman's testimony on timing. First, Dr. Sotelo-Avila, the Cardinal Glennon pathologist who actually examined the placenta (grossly and microscopically), testified that the examination did not allow one to determine the cause or timing of Sean's brain injury.

59.     As a rebuttal witness, plaintiffs called Dr. Theonia Boyd as an expert on placenta pathology. She is the Director of Anatomic Pathology at Children's Hospital of Boston. She is an associate professor of pathology at Harvard Medical School, which the Court assesses to be more qualified than Kliman's research scientist position (even if it is at Yale). Like Dr. Sotelo-Avila, Dr. Boyd testified

that the placental findings here do not allow a pathologist to opine on the cause of Sean's injury or the timing of his brain injury.

60.     Regarding Dr. Kliman's theory that "meconium-laden macrophages" on the placenta point to an event 24-48 hours before birth, Dr. Boyd testified that Dr. Kliman is the only pathologist who holds such a view.  She cited a 2011 paper by a Dr. Incerti which discusses Dr.Kliman's article on this subject.  The 2011 article concludes:  "[T]he presence of meconium in macrophages cannot be used to time the occurrence of a fetal insult during labor."  When questioned about that article, Dr. Kliman refused to acknowledge that that statement controverted his macrophage theory.   The Court finds Kliman's testimony on this point lacks credibility.

61.     Dr. Boyd and Dr. Sotelo-Avila testified that meconium can be found in the macrophages within hours of a meconium discharge.  Thus, if there was meconium in the macrophages, it does not point to an event 24-48 hours before birth.

62.     Dr. Kliman's entire testimony on meconium was also undermined by his admissions that a fetus under hypoxic-ischemic stress may or may not discharge meconium.  He also admitted that fetuses may discharge meconium without stress. So, the presence or absence of meconium is not persuasive of anything.

63.     On the whole, the Court finds the testimony of Dr. Sotelo and Dr. Boyd more credible than that of Dr. Kliman.

64.     The United States' final opinion witness was Dr. Allison Cahill, a maternal fetal medicine physician from St. Louis.  Regarding the cause of Sean's injury and the timing of his injury, the Court took nothing away from her testimony that was instructive or constructive.     She testified *on direct examination* as follows:

    A.    "I'm not an expert on brain injury."

    B.    It was not "within" her "expertise" to testify whether delivery around 8:30 a.m. on July 30 would have made a difference in this case.

65.     The apparent purpose of Dr. Cahill's testimony was to discredit the brain injury testimony of Dr. Giles and Dr. Bryan.   She testified that no obstetrician could ever be an expert on neonatal brain injury, even though almost all of the members of the "ACOG Task Force on Neonatal Encephalopathy and Cerebral Palsy" are obstetricians.

**<u>Definition of Reactive and Nonreactive FHR Tracing</u>**

66.     During her testimony, defense witness Dr. Cahill used the phrases "reactive" and "nonreactive" to describe the FHR tracing for Sean.  ACOG bulletin 9 (PTX 25) concludes with a "Summary" that if an FHR strip is nonreactive, physicians "usually should" do a "full BPP" and then "management should be predicated on the results of the . . . BPP." (PTX 25, p. 8-9)  That is what occurred here. No testimony in this case remotely suggests that a "nonreactive" FHR tracing

requires delivery.  Indeed, Dr. Cahill testified that she would not have delivered Sean even when his baseline heart rate dropped precipitously to 110.

67.    Dr.  Cahill  did  not  fully  explain  the  phrases  "reactive"  and "nonreactive" for this Court.  Thus, during closing arguments, this Court posed a question about the meaning of "nonreactive."  It is now this Court's understanding that nonreactive does not mean:

- "Nonreactive" does not mean a baby is dead.

- "Nonreactive" does not mean a baby is "nonviable."

- "Nonreactive"  does  not  mean  there  was  an  absent  fetal  heart  rate "reaction" during NST testing.

- "Nonreactive" does not mean there has been a neurologic injury to the fetus.

- "Nonreactive" does not mean the same thing as "nonreassuring."

68.    As  it  turns  out,  ACOG  Practice  Bulletin  9  ("Antepartum  Fetal Surveillance")  defines  and  discusses  the  phrases  "reactive"  and  "nonreactive." (PTX 25)  According to ACOG bulletin 9, "nonreactive" usually means the fetus is sleeping.[3]  The bulletin provides:

> "Loss of reactivity is associated most commonly with a fetal sleep-cycle  but  may  result  from  any  cause  of  central  nervous  system depression, including fetal acidosis."

(PTX 25, p. 3).

---

[3] Dr. Cahill did not mention that "nonreactive" usually means the fetus is sleeping.  This was something Dr. Michelle Murray mentioned in her testimony regarding the strip.

24

69.     ACOG bulletin 9 defines "reactive," but acknowledges "[v]arious definitions of reactivity have been used." (*Id*.)  In bulletin 9, accelerations are defined as a FHR increase of "at least 15 beats per minute above the baseline and last 15 seconds from baseline to baseline." (*Id*.)  According to bulletin 9's definition of "reactive," "the NST (fetal heart rate strip) is considered reactive (normal) if there are two or more fetal heart rate accelerations (as defined previously) within a 20-minute period, with or without fetal movement discernible by the woman." (PTX 25, p. 3).  A "nonreactive NST is one that lacks sufficient fetal heart rate accelerations over a 40-minute period." (*Id*.)  Thus, a FHR strip with excellent variability, a normal baseline, absent decelerations, one 15 x 15 acceleration and numerous accelerations of 14 x 14 over 40 minutes would not meet the strict definition of "reactive" in ACOG bulletin 9.

70.     Again, a "nonreactive" strip "is associated most commonly with a fetal sleep cycle." (*Id*.)  Thus, nurse Erin Griffin's note at 7:08 a.m. on July 30 that Dr. Bishop was aware of the "non-reactive strip throughout the noc (night)" (PTX 4, p. 4) must be considered in the context of fetal sleep cycles.


**This Case Involves What Was "A" Proximate Cause of Sean's Brain Injury**

71.     Plaintiffs must prove that one of the many violations of the standard of care by Dr. Bishop, Dr. Afriyie-Gray and/or Dr. Panchamukhi was a proximate cause of Sean's brain injury.  Under Illinois law, proximate cause is defined as follows:

> "When I use the expression 'proximate cause,' I mean a cause that, in the natural or ordinary course of events, produced the plaintiff's injury. It need not be the only cause, nor the last or nearest cause. It is sufficient if it combines with another cause resulting in the injury."

(Illinois Pattern Jury Instructions Civil 15.01 (2011)).[4]

72. Illinois law also provides that it is *not a defense* that "some third person" or "something" may have also been a cause of the injury. (IPI Civil 12.04 and 12.05). Thus, so long as a violation of the standard of care by Dr. Bishop, Dr. Afriyie-Gray or Dr. Panchamukhi was *a* proximate cause of Sean's brain injury, then plaintiffs must recover.

73. This is not a case where the defense argues "we do not know what caused the brain injury here." This is a unique case in that *all the medical testimony* is that Sean suffered a brain injury from oxygen deprivation to his brain. In medical terminology, he suffered a hypoxic-ischemic brain injury. Thus, the more precise question here is: Was a violation of the standard of care by Dr. Bishop, Dr. Afriyie-Gray or Dr. Panchamukhi a proximate cause of Sean's hypoxic-ischemic brain injury?

74. In answering the proximate cause question, Rule 702 requires experts to have a sound methodology. As Dr. Boyer explained, since it is clear that Sean suffered an injury from oxygen deprivation, then a review of his medical records (a clinical correlation) must focus on any evidence of oxygen deprivation in the records. The only evidence of oxygen deprivation sufficient to cause Sean's

---

[4] All "IPI" citations are to the Illinois Pattern Jury Instructions, Civil Edition 2011.

brain injury occurred in the last approximately 40 minutes before his birth and then continued after birth.  This is the only time in the medical record when the following occurred:

- Sean's heart rate dropped to 110.  (PTX 3, p. 208)

- Patoya was given oxygen to help Sean receive oxygen.  (*Id*. p. 208)

- Sean's heart rate crashed to 60.  (*Id*. p. 208)

- Sean had no heart rate for at least one minute ("Absent" heart rate at one minute)(Apgar scores listed at PTX 1, p. 81)

- Sean's heart rate remained below 100 for at least five minutes (Apgar scores for 1 and 5 minutes)

- Sean had no respiratory effort for at least 10 minutes. (Apgar scores for 1, 5 and 10 minutes)

- Sean was blue from lack of oxygen for at least 10 minutes. (Apgar scores for 1, 5 and 10 minutes)

- Chest compressions were administered for 10 minutes to ventilate Sean.  (PTX 1, p. 82).

- Sean was intubated and given supplemental oxygen.  (*Id.)*

- Sean received the drug epinephrine to help his heart pump blood to his brain and rest of his body.  (*Id.)*

75.     No medical witness for the government identified any other point in time when something occurred sufficient to cause Sean's hypoxic ischemic brain injury.  On the contrary, Dr. Gordon Sze testified by videotape as follows:

> Q.     So if we limit our analysis to the fact that Sean has this partial prolonged brain injury, Sean's permanent brain injury could have occurred in the last 30 minutes before he was born?

> A.    Well, it's almost semantics, but I said at least half an hour.  So not within 30 minutes, but longer than 30 minutes.
>
> * * *
>
> Q.    If we limit our analysis to the fact that Sean has a brain injury of the partial prolonged type, Sean's permanent brain injury could have occurred in the 45 minutes before his birth?
>
> A.    That is correct.

(Dr. Gordon Sze video testimony, Tr. p. 46).

76.    It is not unusual for defendants to argue a baby suffered a brain injury from some unknown cause at some unknown time.  Here, however, we know the cause (oxygen deprivation) of Sean's brain injury.  In terms of timing, the only evidence in the medical record that could have caused Sean's hypoxic-ischemic brain injury occurred in the last forty minutes before his birth and continued for at least ten minutes after he was born.  It is disingenuous for the government to argue Sean's hypoxic-ischemic brain injury occurred a time other than the only time he was subjected to severe oxygen deprivation for a period clearly long enough to cause his brain injury.  Finally, it is important to note that none of the government's witnesses testified that the events in the last 40 minutes before Sean was born and the resuscitation period after his birth had nothing to do with his brain injury.

77.    As noted at trial, Sean even clears the high medical hurdle published by ACOG to prove his brain injury was caused around the time of birth.  As noted at trial, the NEACP document published by ACOG "focuses on neonatal encephalopathy and HIE and later outcome in term and near-term infants."

28

(NEACP Chapter 1, p.1).  Sean even meets the ACOG criteria.  (*See* attached PTX 113).

78.    The negligent actions of Dr. Bishop, Dr. Afriyie-Gray and Dr. Panchamukhi were a proximate cause of Sean's brain injury.

79.    Sean's brain injury occurred in the hour or two before delivery and approximately ten minutes after delivery.  (*See* attached PTX 115)

## The 8/8 BPP Score Was A Reliable Score

80.    A timing analysis of Sean's injury requires a discussion of the first BPP score of 8/8.  As noted above, the United States claims this score is not reliable because Patoya's abdomen was manipulated before the test (to wake Sean from a sleep cycle).

81.    Dr. Bishop took the stand and he did not even testify that the first BPP result was invalid.  Dr. Cahill was the only witness to testify for the United States regarding the validity of the first BPP score.  Her testimony was not persuasive for the following reasons:

   A.    Unlike Dr. Giles, she never reviewed the BPP images from the test;

   B.    She is not a Registered Diagnostic Medical Sonographer, like Susan Lingle and Dr. Giles; and

   C.    She could not cite to any literature which provided that it was improper to "manipulate" the abdomen before starting the test.

29

### Sean Cobbs' Testimony Regarding the First BPP Test

82.  The government, in the pursuit of advocacy not facts, elicited restricted testimony from Sean Cobbs which the Court finds disingenuous.  Mr. Cobbs gave deposition testimony in which he at first clearly overstated his actions at the time of Patoya's first BPP test.  What is equally clear to the Court is that depending on what medical facility a person is in, when a technician or doctor is about to undertake a BPP test, if the fetus is sleeping, some method will be employed to wake the fetus.  This might be accomplished by an instrument that vibrates or by manual manipulation of the mother's stomach.  By whatever method, the slumbering fetus might be quick to react or not so quick to react.  In this case, the fetus was slow to respond.  In fact, the nurse could not arouse the fetus in the first couple of minutes.  Sean asked if he could try and he undertook the same type of back and forth motion of Patoya's stomach without success and then tried a little harder, finally able to wake the baby and obtain movement.  Thereafter, the BPP test was performed.  However, prior to describing the maneuvering in actual detail in his deposition, Sean Sr. (who the Court observed at trial as a very comfortable witness and prone to levity and far from stoic) cracked wise about pushing Patoya "like a man."  The Court observed Sean Sr. at trial describe this deposition testimony as a "poor choice of words."  The Court's conclusion is, as stated above, that Sean made a wise-crack in his deposition before giving the actual description of the manipulation and the government seized upon it.  The Court finds the truth in the words that follow as Sean

explained what he actually did.  The government's attempt to persuade otherwise
fails. Moreover, since some effort to wake a slumbering fetus is customary and it
is clear the test was not performed during the manipulation but after, the Court
finds the first BPP test to be valid.

83.  Corroborating that evidence is the charting on July 30, 2009, by
nurse Karen Griffin.  At 4:38 a.m., she charted "the pt (Patoya) stated the US tech
had to really physically maneuver her abd to get baby to move."  (PTX 4, p. 3).
Next, in her 7:08 a.m. note, Ms. Griffin charted that the "US tech had to manually
stimulate her abd to get fetal movement."  (PTX 4, p. 4).  Neither note mentions
any conduct by Sean.  Sonographer Susan Lingle also addressed this issue during
her videotaped trial testimony.  She testified as follows during questioning by Mr.
Wyatt:

> Q.   Regarding that first ultrasound, the 1 that was conducted on
> July the 30th, do you recall if anyone else was present other
> than yourself and Patoya?
> A.   Her husband.
> Q.   Her significant other was present?
> A.   Correct.
> Q.   Is that correct?  His name was Sean, or do you recall what his
> name was?
> A.   I don't remember his name.
> Q.   Did Sean ever physically maneuver Patoya's abdomen during
> that first ultrasound exam?
> A.   I don't remember.
> Q.   If he at some point would have pushed hard on her stomach as
> if he were having a fight with another man, if he had pushed
> that hard on her stomach, would you have recalled him doing
> something that like [sic]?
> A.   Yes.
> Q.   Do you recall him doing anything like that?
> A.   No.

(Susan Lingle video testimony, Tr. pp. 73-74)  Ms. Lingle, still under examination by Mr. Wyatt, further testified:

> Q.   Was he ever rocking her stomach back and forth according to your recollection?
> A.   Not according to my recollection.
> Q.   Was he ever pushing her stomach as if he were in a fight with another man?
> A.   No.

(Susan Lingle video testimony, Tr. p. 76).

84.   Thus, the Court finds the first BPP score of 8/8 was accurate and reliable.

85.   Further, there is substantial evidence supporting this conclusion, including the following:

> A.   The same sonographer (Susan Lingle) performed both BPP tests.  No one is claiming the second score (2/8) was not a reliable score.
>
> B.   There is no evidence that the manipulation occurred during the entire 30-minute test.  Patoya, the only witness to address this issue at trial, testified that the manipulation occurred at the beginning and then Ms. Lingle started the test.
>
> C.   Dr. Bishop admitted that the training given sonographers at the time, including training in his own office, was to provide some form of manual manipulation in order to stimulate the baby.  (Dr. Bishop video admission, Tr. p. 24-25).
>
> D.   Dr. Afriyie-Gray admitted there was nothing about the clinical situation at the time that indicated the test was "inaccurate." (Dr. Afriyie-Gray video admission, Tr. p. 32).
>
> E.   Radiologist Christopher Russell, MD of Virtual Radiologic Consultants scored the test 8/8.  (PTX 1, p. 160).

F.  At 4:38 a.m. on July 30, Dr. Afriyie-Gray was informed by nurse Karen Griffin as follows:  "US tech had to really physically maneuver her abd to get baby to move." (PTX 4, p. 3).  Dr. Afriyie-Gray, with this information, ordered that Patoya could go home and do fetal kick counts.  (PTX 1, p. 115; FPO, ¶15)

G.  At 7:08 a.m. on July 30, nurse Griffin charted that she told Dr. Bishop the 8/8 score and that the "US tech had to manually stimulate her abd to get fetal movement." (PTX 4, p. 4).

H.  Dr. Bishop admitted that Dr. Afriyie-Gray, Dr. Sanford and he discussed the 8/8 score around 9:00 a.m. on July 30. No one questioned the accuracy of the result and all relied on it to continue the pregnancy at that time.   (Dr. Bishop video admission, Tr. p. 28-29).

I.  Registered sonographer Susan Lingle considered the score reliable.  (Susan Lingle video testimony, Tr. p. 40).

J.  Registered sonographer Dr. Giles considered the score reliable and testified that manipulating the abdomen is standard practice.

K.  Nurse Michelle Murray cited multiple medical articles in her testimony that manipulating the abdomen before a BPP test does   not affect the reliability of the score.

L.  The government's reliance on the articles showing that only one out of 1000 BPPs of 8/8 result in stillborn birth within seven days is misplaced.  First, Sean was resuscitated.  Also, the articles do not disclose how many of the thousand babies were delivered during those seven days, with or without neurological issues.  Dr. Cahill did not know, since the articles were silent on that significant point.  So, the fact that only one in 1000 died is not evidence that someone born with neurological deficits (in this case, because of negligence), could not have had an 8/8 BPP score within a week. As ACOG Bulletin 9 notes, an 8/8 score is "highly reassuring." (PTX 25, p. 5).  Nothing more.  It is not a guarantee.

86.     The final evidence regarding the reliability of the BPP score is the following quote from Dr. Bishop's discharge summary, which he signed almost three weeks after Sean's birth:  "The *completely reassuring biophysical profile* around the time of admission also weighed in the balance" to allow Patoya's pregnancy to continue.  (emphasis added).  This was 19 days after Sean's birth and certainly gave Dr. Bishop plenty of time to consider whether the result was accurate.  He concluded it was "completely reassuring."  (PTX 1, p. 52).  Only after the United States was sued for his conduct did Dr. Bishop change his tune and believe the score was not reliable.

### III.   DAMAGES

### Comparable Damage Awards In Similar Cases

87.     The Seventh Circuit Court of Appeals has urged trial courts to consider comparable damage awards in similar cases.  *See Jutzi-Johnson v. United States*, 263 F. 3d 753, 759 (7th Cir. 2001).

88.     There are at least three similar Federal Tort Claim Act cases that have been tried in the Seventh Circuit in the last ten years.  Those cases are:

    a.   *Bringas v. United States*, No. 08-cv-435 (N.D.ILL, 2010);

    b.   *Arroyo v. United States*, (2010 WL 1437925) (N.D.ILL).; and

    c.   *Union Planters Bank, NA, Temporary Guardian of the Estate of Javan Coleman v. United States,* No. 01-cv-0314-DRH (S.D.ILL 2003) (Document 31-1, 7/24/03)

34

89.     Although the disabilities in each case differ, all, like Sean, involve severe brain injuries and accompanying disabilities.  As Dr. Dietzen noted, Sean's ability to walk creates a lifetime of safety issues for him.  Those issues are not necessarily present in the above cases.

90.     In determining damages, the *Arroyo* court reviewed no less than ten prior cases which it considered to be similar.  Likewise, the *Bringas* court considered reports of verdicts in similar cases.  A search of the *Illinois Jury Verdict Reporter* did not disclose any verdicts after *Arroyo*. The review of *Bringas, Arroyo*, and *Coleman* reveals the following analysis.

### DAMAGES IN COMPARABLE CASES

|                          | *Bringas*     | *Arroyo*      | *Coleman*     |
|--------------------------|---------------|---------------|---------------|
| Lost Earnings            | $  1,964,081  | $  3,990,250  | $  1,836,590  |
| Future Care              | $19,275,977   | $15,468,905   | $10,916,959   |
| Past Medical             | -             | $     600,380 | -             |
| Loss/Normal Life         | $  5,000,000  | $  5,000,000  | $  2,000,000  |
| Pain & Suffering         | $  2,000,000  | $  2,100,000  | $  4,000,000  |
| Disfigurement            | $  2,000,000  | $  2,000,000  | $     500,000 |
| Risk of Future Harm      | -             | -             | -             |
|                          |               |               |               |
| **Total**                | **$30,240,058** | **$29,159,535** | **$19,253,549** |
| **Increase in CPI**      | 8%            | 8%            | 27%           |
| **Total (Inflation Adjusted as of July 2013)** | **$32,659,263** | **$31,492,298** | **$24,452,007** |

**Elements of Damages**

91.     The following are the elements of damages which can be awarded in Illinois, taking into consideration the nature, extent and duration of the injury (IPI 30.01):

- Disfigurement (IPI 30.04);

- Loss of a normal life (IPI 30.04.01);

- Increased risk of future harm resulting from the injuries (IPI 30.04.03);

- Pain and suffering experienced and reasonably certain to be experienced in the future as a result of the injuries (IPI 30.05);

- The reasonable expense of necessary medical care, treatment, and services received, and the present cash value of the reasonable expenses of medical care, treatment and services reasonably certain to be received in the future (IPI 30.06);

- The present cash value of earnings reasonably certain to be lost in the future (IPI 30.07); and

- The reasonable expense of necessary help and the present cash value of such expense reasonably certain to be required in the future (IPI 30.09).

## Life Expectancy

92.     Sean has a normal life expectancy of 67.7 years.

## Economic Damages

## Diminished Earning Capacity

93.    Sean's parents value education.  Sean's father is a college graduate. Sean's grandmother is a grammar school principal.  Sean's great grandmother was a grammar school teacher. Sean's mother will graduate college next May. There is a reasonable inference therefore, absent his injury, Sean would have graduated college. Therefore, the appropriate analysis to consider is for diminished earning capacity of a man with a college education.

94.    Professor Charles Linke's analysis, during the plaintiffs' case, is based on the earnings for full-time year round average male workers in his analysis.  On the other hand, Professor Thomas Ireland used all male workers, including part-time.  Since approximately eighty percent of male college graduates work year round full-time, the Court finds Dr. Linke's analysis more valid.  His upper bound present value projection is $3,874,604.  Dr. Linke's lower bound is $2,559,050.  The middle ground of both of those is $3,216,827.  That number is a fair value for Sean's diminished earnings capacity.

## Past Medical Expenses

95.    The stipulated amount of the Cardinal Glennon bills is $231,713. (PTX ¶48)

## Future Care

37

96.    Dr. Charles Dietzen is the head of Pediatric Physical and Rehabilitative Medicine at Riley Children's Hospital in Indianapolis.  He has many years of experience in treating children with cerebral palsy and also in developing their life care plans.  Jan Klosterman is a Certified Nurse Life Care Planner with years of experience creating life care plans.  Her plans have been for both plaintiffs and defendants in cases involving children with cerebral palsy.  Dr. Dietzen met on two occasions with little Sean, Patoya, and Sean, Sr. at his office in Indianapolis.  Ms. Klosterman met on two separate occasions with them at their home in Carbondale.

97.    On the other hand, defendant's life care planner, Shay Jacobson, never met Sean or his parents.  She never talked to Patoya or Sean Sr. and never even saw a video of little Sean prior to preparing her life care plan.  She did not know Patoya's or Sean Sr., names, what they looked like, or even where they lived.  She is not a Certified Nurse Life Care Planner. Her plan did not even provide Patoya and Sean Sr. any respite care whatever until little Sean is twelve years old.

98.    The Court finds that Ms. Jacobson's plan is deficient.  Furthermore, it is largely dependent on the continued viability of the Affordable Care Act.  As the Court writes this, there are many efforts underway to defund the Act or to repeal the Act.  One political party and particularly a faction within that party have made it an important mission to see to it that it presides over the Act's demise.  The Executive Branch stalls the implementation of one portion or other

of the Act, subjecting it to political bargaining. In short, for a toddler whose care for another sixty plus years is dependent on what is done within this document, the viability of the Affordable Care Act is far too speculative to give Ms. Jacobson's plan any credence.

99. The Court finds Dr. Dietzen and Ms. Klosterman totally credible. Their plan provides a minimum humane level of care, comfort and safety for little Sean. Their plan is the appropriate plan for Sean.

100. Professor Linke's methodology included averaging each of the items from the Klosterman/Dietzen plan to calculate the present value. All of Dr. Linke's methodology was set forth in detail in his report.

101. Professor Ireland concedes that Professor Linke's upper bound net discount rate would be appropriate for what Dr. Ireland refers to as "true" medical expenses. Professor Ireland offered no methodology for determining what constitutes "true" medical expenses, as opposed to "false" medical expenses. Indeed, when asked by the Court about physical therapy costs, he testified that he assumed that they have not gone up and will not go up as much as "true" medical expenses. On the other hand, the medical care segment of the CPI published by the U.S. Bureau of Labor Statistics includes everything in the Klosterman/Dietzen life care plan as medical expenses. (PTX 99). In particular, it includes "fees paid to individuals or agencies for the personal care of invalids, elderly or convalescence in the home including food preparation, bathing, light house cleaning, and other services." Professor Ireland conceded that if the Court

determines that the components of the Klosterman/Dietzen life care plan to be medical expenses, then Dr. Linke's upper bound is the appropriate discount rate.

102.   Sean Sr. and Patoya are adamant that they want to keep Sean in their home.   Therefore, the appropriate amount for future care is Dr. Linke's upper bound value of $15,165,708.


### Non-economic Damages

### Loss of a Normal Life

103.   Sean's loss of a normal life was concisely summed up at the end of his father's testimony, when Sean Sr. testified that his greatest wish is to one day have a conversation with his son.  The fact of the matter is that will never happen.

104.   Little Sean has a 43 full scale I.Q.  He will never have a family of his own.  He will never live independently.  He will be incontinent.  He will never have friends.  He will never ride a bike or swim.  Because he is now mobile, he will always be in danger and can never be left alone.  When his father asked him to pick out an apple among an apple, banana, and orange, he picked out the orange.  Then, apparently thinking the orange was a ball, he tried to bounce it.

105.   For his loss of a normal life, a reasonable amount of compensation consistent with comparable awards in similar cases is $5,000,000.


### Pain & Suffering

106.   Whether he has any recollection from the night before or not, and from his immediate reaction to the tooth brush, Sean Jr. suffers what appears to be excruciating pain daily from the simple hygienic task of his parents brushing his teeth.  He fights back now as a toddler.  One can only imagine what battles will ensue when he is big and strong.  Furthermore, he cannot walk barefoot on concrete because of the pain to his feet.  When his parents suction his nose, all he knows is that they are hurting him.  At night, when they massage and stretch his muscles, all he knows is again that they are hurting him.  Finally, before he goes to bed, he is once again terrorized when he feels the tooth brush.  The testimony about his bowel movements was agonizing to hear.   Sean Jr. goes from constipation to evacuating a huge hard painful excrement that would frighten the toughest man.  He will experience all of these pains every day for the rest of his life.   For that pain and suffering, a reasonable amount of compensation, consistent with similar cases, is $3,000,000.

## Disfigurement

107.   Because of his awkward gait, his microcephalic head, his arm that hangs like a "chicken wing," his leg which is crooked, and his constant drooling, he will forever be the subject of stares wherever he goes.   Sean's physical appearance is the essence of disfigurement.  For that disfigurement, a reasonable amount of compensation, consistent with similar cases, is $2,000,000.

41

**Risk of Future Harm**

108.   As testified by pediatric neurologist Dr. Stephen Glass of Seattle, whose testimony is uncontroverted, Sean has a ten times greater risk of developing a seizure disorder than does a typical four-year-old.  Every time Sean throws himself on the floor in a tantrum, his parents will always wonder if perhaps this is the time**.**  For that one-thousand percent increase in a risk of developing a seizure disorder, a reasonable amount of compensation is $1,000,000.

**Summary Of Damages For Sean**

109.   In summary, the reasonable amount of damages to which Sean is entitled is summarized as follows:

| | |
|---|---|
| Lost Earnings | $  3,216,827 |
| Future Care | $15,165,708 |
| Past Medical | $     231,713 |
| Loss/Normal Life | $  5,000,000 |
| Pain & Suffering | $  3,000,000 |
| Disfigurement | $  2,000,000 |
| Risk of Future Harm | $  1,000,000 |
| Total | $29,614,248 |

**Sean's Damages Compared To Similar Cases**

110.   Below is a chart comparing plaintiffs' request for compensation to compensation awarded in comparable cases:

| | *Bringas* | *Arroyo* | *Coleman* | *Cobbs* |
|---|---|---|---|---|
| Lost Earnings | $  1,964,081 | $  3,990,250 | $  1,836,590 | $  3,216,827 |

| Future Care | $19,275,977 | $15,468,905 | $10,916,959 | $15,165,708 |
|---|---|---|---|---|
| Past Medical | - | $    600,380 | - | $    231,713 |
| Loss/Normal Life | $ 5,000,000 | $ 5,000,000 | $ 2,000,000 | $ 5,000,000 |
| Pain & Suffering | $ 2,000,000 | $ 2,100,000 | $ 4,000,000 | $ 3,000,000 |
| Disfigurement | $ 2,000,000 | $ 2,000,000 | $    500,000 | $ 2,000,000 |
| Risk of Future Harm | - | - | - | $ 1,000,000 |
| **Total to Sean** | **$30,240,058** | **$29,159,535** | **$19,253,549** | **$29,614,248** |
| **Increase in CPI** | 8% | 8% | 27% | N/A |
| **Total (Inflation Adjusted as of July 2013)** | **$32,659,263** | **$31,492,298** | **$24,452,007** | **$29,614,248** |

### Compensation for Patoya and Sean, Sr.

111.  Parents are allowed to recover the reasonable value of caretaking services that would have been allowed if someone had been employed to take care of their child as a result of someone's negligence.  *Worley v. Barger*, 347 Ill.App.3d 492, 807 N.E. 2d 1222 (5th Ill. App. Dist. 2004).  Patoya and Sean have done a remarkable job caring for little Sean.  Every day of his life they have performed therapy, massaged and stretched him, worked on his speech, taught him to catch and throw a ball, and have essentially devoted their lives to him.  Going forward, the probate court managing Sean's estate will determine their entitlement, if any, to future compensation.  For their past services, a reasonable amount of compensation to each of them would be $100,000, for a total of $200,000.

### IV.    AFFIRMATIVE DEFENSES

**Contributory Negligence**

112.   Patoya's compliance or noncompliance regarding diet and glucose control is irrelevant, since there is no causal connection to Sean's injury.  As to this issue, Dr. Giles testified during trial the following:

Q.   Did Dr. Bishop's management of gestational diabetes play any role in cause Sean's brain damage?"

A.   No, it didn't.

Q.   And second, did Patoya's alleged noncompliance regarding diet and blood sugar control contribute to Sean's brain damage?

A.   No, it didn't.

Q.   Can you explain to the Court the basis for your last two answers?

A.   Well, gestational diabetes happens, and it happens very frequently in pregnancy.  That's not something you can prevent.  But gestational diabetes does have the propensity to decrease blood flow through the placenta and decrease placenta reserves.  So to that extent, gestational diabetes may have had a role in the insufficient placental reserve that then lead the child to be in distress and decompensate.  But neither Dr. Bishop's mismanagement of the diabetes nor Ms. Bryant's dietary control influenced that to any significant degree.

(Doc. 100; Trial Transcript, pg. 20).

...

A.   No, sir.  I don't.  I think that the gestational diabetes was a shared duty and responsibility between Dr. Bishop. And while I think I've stated that her diabetes was not optimally controlled, on the other hand I do not believe that had any affect on the outcome of this case, and that's why I did not express any such opinion.

(Doc. 100; Trial Transcript, pg. 61)   Therefore, there is no basis to the government's affirmative defense.

**Reduction for Benefits Received**

44

113. As an affirmative defense, the United States alleged that "any damages recovered by the plaintiffs should be reduced by the amount of any benefits that the plaintiffs have received or will receive from the United States." (United States affirmative defense, par. 5). Plaintiffs are not claiming damages for the cost of therapy received at school. Moreover, the United States did not present any evidence of "benefits that plaintiffs . . . will receive from the United States." There is no basis for a reduction of the award pursuant to this affirmative defense.

### Setoff

114. Plaintiffs settled with Southern Illinois Hospital Services (d/b/a Memorial Hospital of Carbondale) for a total of $1,650,000. Of that, $1,600,000 was for Sean and $50,000 ($25,000 each) for his parents.

## V.   CONCLUSION

Accordingly, based on the rationale, findings and conclusions reached and stated by the Court throughout this order, the Court **FINDS** in favor of Plaintiffs, CSC, a minor, by his parents and next friends, Patoya Bryant and Sean Cobbs, Patoya Bryant and Sean Cobbs and against the United States of America. The Court **AWARDS** Sean Cobbs a total of **$28,014,248** which includes $3,216,827 for lost earnings, $15,165,708 for future care, $231,713 for past medical, $5,000,000 for loss/normal life, $3,000,000 for pain and suffering, $2,000,000 for disfigurement $1,000,000 for risk of future harm and a set of off $1,600,000

from the previous settlement.  The Court also **AWARDS** a total of **$150,000** to Sean Cobbs, Sr. and Patoya Bryant, as parents, which includes $100,000 each and a set off of $25,000 each from the previous settlement.  Lastly, the Court **DIRECTS** the Clerk of the Court to enter judgment reflecting the same.

       **IT IS SO ORDERED.**

Digitally signed
by David R.
Herndon
Date: 2013.12.20
12:41:30 -06'00'

       **DATED:** December 20, 2013

                                     **CHIEF JUDGE**
                                   **U.S. DISTRICT COURT**